Good morning, Your Honors. I'm Ellen Lake, counsel for Appellant Stephen Vallimont, and may it please the Court, I'd like to reserve three minutes for rebuttal. The summary judgment granted in this case must be reversed because there are genuine issues of material fact about whether Chevron honestly and sincerely believed that Vallimont committed the acts of misconduct for which Chevron fired him. Of course, this Court reviews the summary judgment de novo, resolving all factual disputes and all inferences in favor of Mr. Vallimont, the party opposing summary judgment. Counsel, I thought there was testimony from the decision-maker who actually made the termination decision that he relied on the investigation report that was provided to him in making the termination decision. I'm a little curious at your opening as to why there's a contested issue of fact. What evidence do you have that places that material fact in dispute? We have three sets of evidence, and all of which were discussed in our brief, Your Honor. The first set of evidence is that Mr. Vallimont had been working there for 20 years, had gotten excellent performance evaluations, not merely for his work, but also for the way he got along with his coworkers, which is really the issue which is the basis of the misconduct for which they claim he had to be fired. And in volume 11 of the record, starting at page 2673, there are about 30 pages of performance evaluations over the 20 years of Vallimont's employment at Chevron, saying things like all of Steve's coworkers enjoy working with him as he is a team player, or Steve has excellent teamwork skills and is respected by his coworkers, or Steve works positively with all members of his work group, or Steve is an excellent team worker. He maintains tactful and positive relationships with his coworkers. These findings of Chevron over 20 years in an unbroken pattern of praise are so fundamentally inconsistent with Chevron's later assertion that they suddenly discovered all this misconduct that Vallimont had been allegedly involved in and which Chevron maintained he'd been involved in for a long time. But the decision-maker had before him the results of an interview or report of investigation of 32 witness interviews of people who had worked with him for a substantial amount of time and whose explanation for not reporting some of his prior acts of alleged misconduct was that we were afraid of this guy because of threats of retaliation. Your Honor, that's my second point. Second and third point, so let me proceed to respond, I believe. We think the evidence shows that Chevron intentionally tainted the investigation by the way it spoke with and influenced the investigator, Ms. Gallagher. Management told her, quote, there's some history with Steve and he's come very close to getting booted out of the lab, that's at ER 2821. And they told her that Isabel, who is the person who all the evidence tends to indicate, wrote the anonymous letter which touched off this investigation. But I thought he thought it was somebody else. He did. That's what he said. But other of the — And she says it wasn't her. She says it wasn't her, but other employees — Okay, aside from speculation that she is Worker B, what evidence do you have to put that fact at issue? She said to several employees that she was furious with Steve for having accused her of excessive absenteeism and falsifying her time records and she was going to get even with him and she was going to write him up and take him to Mr. Everard and Mr. Tuck, which is exactly what happened in the anonymous — with the anonymous — anonymous Worker B letter. Additionally, after Vallemont was fired, Isabel spoke with two employees and said, oh, I feel so terrible. I didn't mean to get him fired. I just meant to get him in trouble because I was mad at him for coming after me. So that evidence tends to support, besides the fact that the language in the Worker B letter was very similar to the language that Isabel used in her interviews, et cetera. Going back to the investigation, I thought the investigator testified that she got an organizational chart for the plant and that she made the determination as to which witnesses she wanted to speak to and then asked for assistance from management in order to make those employees available for her interviews. Is there any contest over that? Yes. She said that she was told to interview Isabel first, and that's at ER 2012, Volume 9. Is that because Isabel was going on vacation? There was some evidence that she was, but that's not what the investigator said as to why she interviewed her first. Additionally, among the evidence of management — But she's one of the prime complainants under your theory of the case. Why wouldn't you want to talk to her early in the investigation in order to find out the scope of your investigation, what it is that you're going to be investigating? Your Honor, I think the question is, is there — are there disputed issues of fact about whether this was a good-faith, honest investigation? Right. And I'm trying to — I'm asking you what taints an investigation when the investigator decides to first speak with a precipient witness who apparently may be the source of some of the wrongdoing by the employee that she's investigating. Well, the other way to look at that same piece of evidence is that management is, knowing that Isabel is angry at Vallemont and wants to get even with him, is pushing her forward so that the investigation will begin with a big bang as she pours out her fury and her revenge, her wickedness. Before you move the investigation and applying the McDonnell-Douglas balancing test, I'd like to talk about pretext because, as I understand it, he doesn't really deny that many of these incidents occurred. And assuming that you meet the first two parts of the test, what evidence do you have of pretext to show that when the decision-maker decided to fire him, that it was for that reason, that he had admitted the conduct and the decision-maker said, I thought it was so egregious that I couldn't have this employee in the plant anymore? It is absolutely not true that he did not deny most of the conduct. He denied about 95 percent of the conduct. The only part that he admitted was that he had patted or slapped the back of some employees and that he sometimes used language like damn or slightly worse language, but that wasn't even among the. And I'm making a statement about the leaving the fellows camera out when the. Absolutely. He said he had nothing to do with it. And Francis Allotte, whose camera it was, told the investigate, testified that he told the investigator that he did not think Valois had anything to do with this. But there were other witnesses who said that he did. Right.  That's what summary judgment is all about, when there are witnesses on one side and witnesses on the other side. The question here is, the question that would raise the material issue of fact is whether or not the decision-maker relied in good faith on the results of the investigation in determining that the charges were sustained and then determining that the appropriate discipline was termination because of the severity of the conduct. Well, our position is that management signaled to the investigator how it wanted the investigation to come out by comments such as, which I was in the middle of, that Isabel was afraid of Steve, that she saw him grab crotches, that he slapped her on the butt, quote, he pushes people to their limit. They feel he won't get in trouble. Twenty years this has been going on. This is what management told the investigator, who was supposed to be a neutral, independent investigator, but instead. But that's not the decision-maker who told it. Yes. That's lower-level people. No, it is. It is the decision-maker. If you go to Volume 12, ER 2824-5, it is Mr. Hedges and Mr. Tooke speaking with Kathy Gallagher on May 18th. And the information I have is that this was a phone call between Steve and her. It was a phone call between Steve and her. And the information I have is that this was a phone call between Steve and her. 2824 of the ER. Okay. I'll look at it. Dave slash Jeff telephone. Okay. And that's where these comments that I've been reading to you from. They also told her that Francis had admitted, confirmed the cell phone incident as an accusation against Steve Vallemont. He hadn't then. He didn't later. This was totally untrue. So they were setting up the investigation so that it would come out a particular way. And the investigator, of course, picked up on that. And her report misrepresented what a number of employees told her. They misrepresented what Francis Allotte told her in order to say that Allotte was accusing Vallemont of various kinds of misconduct. When Allotte testified in his deposition that he did not believe that Vallemont had taken his cell phone and taken that picture, he did not believe that Vallemont grabbed people's crotches, that Vallemont had never grabbed his crotch, that he was not afraid of Vallemont. All of these things came out the other way from the investigator. The investigator said that Vallemont, that Allotte had confirmed all these accusations. He had denied them. And similarly, on the issue of racist language, the investigator said that Vallemont used the N-word, but all the African-American employees told her that he did not and that he had never had, and that one of them, for example, Mr. Stallworth, had known him and worked with him for 20 years and said, I've never heard Steve use the N-word. He said, I use the N-word occasionally. That's what Stallworth, this black employee, said. But Vallemont never does. And Stallworth also spoke about how the investigator had a closed mind. He wouldn't listen to her. He couldn't get her to understand what he was saying. She wouldn't write down what he was saying. She felt he was very closed-minded. So all the – and then the investigator not only slanted the findings by lying about what the workers had told her, but also by taking phrases out of context and making them what were neutral comments into negative comments. Just quickly, the prima facie case raid discrimination, the district court said that Vallemont did not establish a prima facie case because he didn't meet the similarly situated prong of that four-prong test. But the district court said that was because he was guilty of all this misconduct and no one else was similarly situated. But as we argue it, there is a tribal issue of material fact about whether he was guilty of the vast majority of this misconduct and whether Chevron honestly and sincerely believed that he was guilty of this misconduct. And therefore, there is also a factual issue as to the similarly situated part of the crime. What if Chevron believed it and it wasn't true? What result? If Chevron honestly believed it, then that is satisfactory to their – to the district court finding. But all this other evidence tends to show that they didn't honestly believe it, or at least that there's a tribal issue of fact for which the jury should be given the case. Thank you. Thank you very much. We will now hear from Chevron. Thank you, Your Honor. May it please the Court. Your Honor, the record in this matter is very clear. The appellant has failed to establish even a prima facie case for retaliation or discrimination. Based on this record, there cannot be a finding of either. Beginning with the issue of discrimination, there is absolutely no evidence of any similarly situated employees outside of plaintiff's class. The law in this area is very clear within the Ninth Circuit that a plaintiff must demonstrate that he is similarly situated to employees in, quote, all material respects. That's the Moran decision. Individuals are similarly situated when they engage in similar or the same conduct with no mitigating or differentiating circumstances. That's the Stanley v. USC case. In this case, Your Honors, the appellant, Mr. Ballamont, stood alone. The record establishes that he was terminated for six distinctive separate categories of misconduct. It included those that were enumerated, grabbing crotches, slapping male and females on their rear ends, exposing workers to nude photos on his own cell phone, using a co-worker's cell phone, Mr. Allete, to take pictures of his own genitals and post it on his cell phone, using racial epithets repeatedly, ongoing, numerous times, many individuals, making threats to co-workers, saying such things as, I own weapons, I own rifles, I own pistols, I have a sibling who's a police officer, I can get things done, I'll take a chainsaw to someone's fence if they wrong me. He threatened co-workers. It was reported. These categories of misconduct. Kennedy gave 20 years good records. The records, Your Honor, are mixed. There are workers who said that he was good to work with because he paid attention to detail, that they enjoyed working with him, but these were the same individuals who also said, you don't wrong Mr. Ballamont. They were afraid of him. There were individuals who were afraid to cooperate with the investigator. They said they were very concerned about retaliation. You don't wrong Mr. Ballamont. That also came out. And it wasn't just one, it wasn't just two. Of the 32 interviews that the interviewer, interviews that were done, there were many, many individuals who expressed this concern and fear of Mr. Ballamont. And there was tremendous corroboration of all of these different activities attributed to Mr. Ballamont. There were no comparators that they were able to show to the district court. There were no comparators that they were able to show in this record. Are we going to find that in the dictionary? Comparators? Yeah. Well, Your Honor. Is that a Ninth Circuit term? That's a good point, Your Honor. Actually, it may be a Ninth Circuit term. By now, maybe it is. By now, maybe it is. But there aren't individuals with like circumstances. The ones they attempted to promote was Stallworth, Alate, and Doug Dio. Those were the three that they tried to say were similar. But the record establishes that they clearly were not. Alate, with respect to what he had done, consisted of an issue. He grabbed his own crotch on one occasion, and he rubbed up against a coworker. Now, when that information came out, he was disciplined. He was given a written warning. Doug Dio, she left a voicemail with regard to Mr. Alate, and she made references to his race. She also was ñ it came out after the fact that she had had a consensual relationship with a coworker 10 to 14 years earlier. They considered that, and she was given a written reprimand as a written warning. Mr. Stallworth was also found to take actions which consisted of slapping the behind of a male coworker. He permitted the N-word to be used with reference to himself on occasion, and he interfered with the investigation of this incident by trying to persuade coworkers not to cooperate with the investigation. While serious and contemplation of a form of discipline, that was to be meted out, he was given a three-day suspension without pay. None of these individuals compared to any of the activity or actions that the appellant in this action did. Judge White below was correct when he made a ruling in finding that there were no people of similarly situated conditions. Moving on to the issue of retaliation with regard to the finding of a prima facie element. The appellant here has failed to make a prima facie case for retaliation. The record fails to demonstrate that the appellant made any protected activity that would be protected in connection with this claim. His only complaint in this case is that he complained about a coworker, that's Ms. Delgadillo's, excessive absenteeism. That's all he said. He reports a coworker for absenteeism. How does, and this is an aside obviously, but how does taking too many sick days, is that a violation of company policy? You can't get sick? Oh, as an aside, excessive absenteeism, Your Honor, can be a problem. Even if it's documented as medical? No, if it's documented medical, then you're on short-term disability. You've got all sorts of protections under the law. But just being sick and being out, failure to report to work, if it's excessive, can be grounds for termination. But with regard to the complaint here that he made about Ms. Delgadillo, this was not a complaint for discrimination, no dispute. It was not a complaint about unfair treatment due to someone's race, no dispute. It's simply the reporting of a coworker. And the law is very clear in this area that an unfair business practice does not amount to actionable discrimination. Furthermore, there's no evidence in the record at all linking the reporting of Ms. Delgadillo's absenteeism with the decision to terminate him. No link at all. In fact, the decision-maker, which was one individual, and that was Mr. Jeff Hedges, he was never even aware of the appellant's reporting of Ms. Delgadillo's absenteeism, absences in any regard. This came later on after the decision to terminate was made. Therefore, the evidence is clear that appellant's termination had nothing to do with any actions of reporting of absences by Ms. Delgadillo. What I'd like to do now is to move on to the issue of pretext and address the pretext with regard to discrimination and retaliation. And for the sake of argument, I want to assume that there's a different record in connection with this case that exists. The different record is one where there was a prima facie case that actually was shown. Even if that were the case, there would be no grounds for any liability in this action, and summary judgment would be properly granted. And the reason for that is because the evidence is undisputed in this case that there was legitimate business decision, business judgment, and business reason for terminating Mr. Valamont, and that was due to his gross and egregious misconduct. Jeff Hedges, Your Honors, was the only decision-maker in this case. Once he made his decision, based on his review only of the investigation summary report, he took his decision that he had made and he ran it by HR. He said, this is the decision I've made, here are my reasons. He also ran it by his supervisor, Paul Allenson. This is the decision that I have made. What do you guys think? They agreed. They concurred. But it was clear that Mr. Hedges was the sole and only ultimate decision-maker with regard to the decision to terminate Mr. Valamont. Therefore, to establish a claim of discrimination or retaliation, the evidence must show, the record in this case must show, and the burden is on the plaintiff, to show that there was a pretext, that the real reason that Mr. Valamont was terminated had something to do with other than the investigative summary report. And this record is devoid of any such evidence. Absent substantial evidence of a pretext, summary judgment is appropriate. That's a Stepel v. Motorola decision. Let's address the reasons specifically for the termination in this case. The evidence is undisputed and this record is solid that the sole basis for the termination was the investigation done by Kathy Gallagher. Kathy Gallagher was a 30-year employee of Chevron. Her sole job was to do investigations of this nature. She was trained. She had experience. She had performed over a hundred previous internal investigations. She wasn't even in the department where – she wasn't working in the department where this investigation was done. She was on loan from another department. The significance of that is that Ms. Gallagher came in completely untainted. She didn't know the parties. She didn't know the coworkers. She didn't know the managers. She knew no one. She came in as a blank slate into this department. And the first thing she asked was for an organizational chart. And she said, let me see who we've got here, the org chart, and I will decide who I'm going to attempt to interview. She then selects 32 people. And over the course of the next two weeks, working seven days a week, she worked weekends as well. Did she get over that? I hope she did, Your Honor. She a learned professional. I hope she did. And I'm sure she did. She was deserving. They do the report. They come out with it. And Mr. Hedges takes a look at that report. He reads it and he relies solely on that report and on nothing else. There is no recommendation that's given to him by Ms. Gallagher. She doesn't write the report, the summary, and then say, here's what I recommend you do. What's your response to opposing counsel's observation and citation to the record regarding the comments that Hedges and other managers made to her at the outset of the investigation about Mr. Valma's prior behavior that had almost got him booted out of Chevron? First of all, Your Honor, I don't think that's the state of the record. Secondly, with regard to the reference about the booting that's in the investigative report, the record is clear that Ms. Gallagher did not know who made that reference. There's no testimony as to where that came from, whether it came from a co-worker that was reported to Ms. Gallagher or where it went. So what's clear in the record is that that comment is not attributable to anyone specifically. What about this May 18th meeting with Hedges and Tuck and Gallagher? The only issue there was that they saw the list of individuals who were going to be interviewed, which was 32 people. Ms. Delgadillo was on that list to be interviewed, and they were aware that Ms. Delgadillo had a vacation planned. So they merely advised Ms. Gallagher that if you want to interview this person, she's going on vacation. You need to do it sooner than later. That was the answer. During the investigation, during all of the interviews with these 32 individuals, not one soul made any complaint or report about Ms. Delgadillo. Mr. Valamont, the appellant here, when he was interviewed on two separate occasions, never made any comment, any complaint, any accusation, anything of that nature against Ms. Delgadillo. Never happened. During the lawsuit and during responses to interrogatories, Rule 26 disclosures, never a statement is made about Ms. Delgadillo on any concern with respect to any issues that are being raised now. But the bottom line is the report that came out and the summary that is reviewed is the sole thing that Mr. Hedges relies upon in making his decision to terminate. And there is no dispute in the record that that report makes no reference, no claim, or no allegation with regard to Ms. Delgadillo. On that basis, there can be no liability based on the good faith decision-making and based on the report reviewed by Mr. Hedges. And that's the Stegel decision versus Sededal Broadcasting. As stated in the very well-known case of Willis v. Marin County, the Court never sits as a super personnel panel. Even a bad or mistaken business decision does not give rise to liability. Now, it is certainly our contention here that the report that was done was a great, was an excellent report, was an accurate report, was an honest report. But what the case law makes very specific and very clear is that even if you have a report that was not a good report or not accurate, that does not give rise to liability so long as the decision-maker relied upon that report in making their decision. And the whole thrust of this appeal by the appellant is to try to attack the report. But there's no evidence in this record that Mr. Hedges did not rely upon that report, and there's no evidence in this case that Mr. Hedges, the decision-maker, had any information other than what was in that report. They have attacked Kathy Gallagher's investigation. But I would submit to this Court that that's the wrong inquiry for purposes of liability. The only pertinent inquiry that should be made is whether there's any evidence in the record that the decision-maker, Jeff Hedges, did not believe what was in that report. And I submit to this Court that there is no such evidence in this record. As the Court in Elrod v. Sears stated regarding investigations, and I'll read this to you. And I think that puts this case in a nutshell, because it's the identical situation in this record.    And I submit to this Court that there is absolutely no evidence that Mr. Hedges terminated the appellant for any other reason except for the findings that were made and reported to him in the comprehensive investigation summary prepared by Kathy Gallagher.  Your time has expired. Thank you, Your Honor. Let's see. Counsel, I think you've got just a minute and 26 seconds left. Your Honor, there's a lot of authority, both in this Court and in the California courts, for a stringent, careful review of the facts relating to investigations in cases such as this. The case that we cited for this Court is Perez v. Curcio. And in the California courts, the Reeves v. Safeway and Nazir v. United Airlines, the latter two in our reply brief. The Court looked carefully to see whether investigations are, in fact, conducted in good faith and whether there is any evidence of tainting improper influences on the investigation. In each of those three cases, the courts, including this Court, reversed summary judgment where they found that the investigation was, in fact, tainted either by the information that went in at the beginning or in the way the investigation was carried  out. This, the investigation... I think both sides agree on that being part of what we look at. But I thought you said at your conclusion that if the decision-maker didn't know about the taints and in good faith relied on that report, is there any evidence that the decision-maker was not acting in good faith? Yes. The evidence is that the decision-maker... Give me your best shot. The decision-maker put in evidence in order to taint the investigation from the beginning by telling the investigator about how Isabel was afraid of Steve Vallemont, saw him grab crotches, slapped her on the butt, pushes people to their limit, they feel he won't get in trouble. Twenty years this has been going on. The cell phone incident was confirmed. When did the decision-maker tell Ms. Gallagher that? On the 18th of May, 2007, at pages ER 2824 to 2825. And the decision-maker had just continued to meet with the investigator daily during the investigation, which is subject to the inference that he was continuing to try to influence her as the investigation occurred. But also the fact that the investigator made the serious misrepresentation about what the employees had told her and what, you know, there has to be a reason for it, and a reasonable inference is that she was carrying out, she felt she was carrying out the results of the investigation that she believed Hedges had asked her to find. Thank you, counsel. Your time has expired. The case just argued is submitted for decision and will be adjourned until tomorrow morning.
judges: Tarnow, Thompson, Tallman